## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**CRISTINA KELLOGG,**

    **Plaintiff,**

**v.**

**FANNIE'S INC. d/b/a FANNIE'S CABARET and WILLIAM H. "BRIAN" PARKS,**

    **Defendants.**

**CIVIL ACTION FILE**

**NO. 1:18-CV-1929-MHC**

## ORDER

Plaintiff Cristina Kellogg ("Kellogg") brings this action against Defendants Fannie's, Inc. d/b/a Fannie's Cabaret ("Fannie's") and William H. "Brian" Parks ("Parks") (collectively, "Defendants") based on allegations that Defendants violated the Fair Labor Standards Act of 1938, as amended ("FLSA"), 29 U.S.C. § 201 et seq.  Compl. [Doc. 1].  Kellogg alleges that, from April 2015 through December 2017, she was employed at Fannie's, an enterprise engaged in commerce under the FLSA, and that Defendants failed to compensate her at an hourly rate above or equal to the minimum wage established by the FLSA.  See id.

This case comes before the Court on Parks's Motion for Summary Judgment

[Doc. 78] and Kellogg's Motion for Partial Summary Judgment [Doc. 80].

## I.   BACKGROUND[1]

### A.   Factual Background

Fannie's operates a nightclub called Fannie's Cabaret (the "Club"), "which

features entertainment in the form of nude female dancing."  Kellogg's SMF ¶ 1;

Fannie's SMF Resp. ¶ 1.  Fannie's website states as follows: "Atlanta's Premier

Adult Entertainment is exclusively found at Fannie's Cabaret.  Staffing over 150

entertainers with a carefully balanced mix of the most beautiful women in Atlanta.

The most beautiful fully nude dancers in the Southeast work at Fannie's Cabaret."

---

[1] The Court views the evidence presented by the parties in the light most favorable
to the non-movants and has drawn all justifiable inferences in favor of the non-
movants.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270
(11th Cir. 2013).  In addition, the Court has excluded assertions of facts that are
immaterial or presented as arguments or legal conclusions or any fact not
supported by citation to evidence (including page or paragraph number).
LR 56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in the
parties' respective statements of material facts that have not been specifically
controverted with citation to the relevant portions of the record.
LR 56.1B(2)(a)(2), NDGa.  See Statement of Undisputed Material Facts in Supp.
of Def. William H. Parks' Mot. for Summ. J. ("Parks's SMF") [Doc. 78-1]; Pl.'s
Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried
("Kellogg's SMF") [Doc. 80-1]; Defs.' Resp. to Pl.'s Statement of Material Facts
("Fannie's SMF Resp.") [Doc. 84-1]; Defs.' Statement of Material Facts in Opp'n
to Pl.'s Mot. for Summ. J. [Doc. 84-2].

Rule 30(b)(6) Dep. of Andrew Cargill taken on Feb. 28, 2019 ("Cargill 30(b)(6) Dep.") [Doc. 76-1] at 23, 25 & Ex. 2 [Doc. 76-3]. Between 2015 and 2017, Fannie's admittedly was "an enterprise engaged in commerce or in the production of goods for commerce" under the FLSA. Defs.' Resps. to Pls.' First Continuing Reqs. for Admission [Doc. 76-40] ¶¶ 8-10. During 2015, 2016, and 2017, Fannie's sold alcohol, paid rent for its facility, maintained two stages, maintained four "VIP Rooms," and played music in the Club. Kellogg's SMF ¶¶ 3-10; Fannie's SMF Resp. ¶¶ 3-10.

Fannie's employed Andrew Cargill ("Cargill") as its General Manager and Daniel Bass ("Bass"), Brian Gann ("Gann"), and Kenneth Graham ("Graham") as managers (collectively, the "Managers") during the time period Kellogg performed at the Club. Kellogg's SMF ¶¶ 12, 14; Fannie's SMF Resp. ¶¶ 12, 14. The Managers possessed the authority to terminate a dancer's relationship with the Club. Kellogg's SMF ¶ 15; Fannie's SMF Resp. ¶ 15. During the time period Kellogg performed at the Club, Fannie's also employed a House Mom, Brenda Dulaney ("Dulaney"), who was known as "Spirit." Kellogg's SMF ¶¶ 17-18; Fannie's SMF Resp. ¶¶ 17-18. Sheyda Hovanloo was a fellow dancer at the Club, who worked at Fannie's from approximately August 2014 and until May 2016.

3

Dep. of Sheyda Hovanloo taken on Mar. 19, 2019 ("Hovanloo Dep.") [Doc. 79] at 21.

The parties dispute the length of time Kellogg performed at Fannie's. Kellogg claims that she was a dancer at the Club from June 2014 until July 2018. Decl. of Cristina Kellogg ("Kellogg Decl.") [Doc. 80-2] ¶ 3.  Cargill contends that Kellogg worked at the Club during various weeks during calendar year 2017 and never performed in 2015, 2016, or 2018.  Decl. of Andrew Cargill ("Cargill Decl.") [Doc. 84-3] ¶¶ 25, 26.  Cargill also testified that dancers execute a "Professional Performer Packet" and decide whether to be classified by Fannie's as an employee or as an independent contractor.  Cargill 30(b)(6) Dep. at 107.  The record contains a series of documents executed by Kellogg in January and March 2017, in which she opted to work as a "Contracted Performer" rather than as an "Employee."  See Exs. 22-25 to Cargill 30(b)(6) Dep. [Docs. 76-23 through 76-26].  The agreement states, in part, that as a "Contracted Professional Performer," Kellogg can set her own hours and work schedule, will not be required to meet any dance or VIP Room quotas, can decide whether or not to tip any workers, and will not be required to follow any rules or policies other than "those set by governing authorities."  Ex. 24 to Cargill 30(b)(6) Dep. [Doc. 76-25 at 3]. The agreement signed by Kellogg also states that the Club sets a "service fee" for a

Table Dance of $10.00 and for an Hourly Room Performance of $300.00; the performer will collect the service fees for the Club and the Club will then "[t]ake possession of its 'Service Fees'" the Club will retain a set amount of its service fees for staff bonuses or expenses; the performer's payment will come from the service fees; and compensation collected by the performer through the service fees would be in lieu of receiving a minimum wage as an employee. Id. at 4-5.  There is a dispute as to what happened in practice, which will be discussed in more detail below.

Parks was a majority owner of Fannie's until 2004 when he "sold all but 25% of the business and resigned from his operational role at [Fannie's]."  Parks's SMF ¶ 2.[2]  After this point, he had no management or supervision role at Fannie's, made no employment decisions, made no decisions about how much workers should be paid, had no authority to manage workers' schedules, had no responsibility in preparing or keeping payroll records, and had no role in setting workers' schedules or wages.  Id. ¶¶ 3-6.

---

[2] Kellogg did not respond to Parks's SMF, so those facts presented by Parks are deemed admitted.  See LR 56.1B(2)(a), NDGa; see also FED. R. CIV. P. 56(e)(1) (stating that when a party fails to respond to another party's assertion of fact, a court may consider the fact undisputed).

Parks did not know Kellogg, recall hiring her, or take any role in supervising her.  Id. ¶ 7.  After his retirement in 2013, Parks lived in Florida full-time and only visited Fannie's infrequently, stopping in to say hello to the current management.  Id. ¶¶ 8-9.  Parks has never been known as "Brian."  Id. ¶ 10.

### B.    Procedural Background

Kellogg filed her Complaint on May 2, 2018, alleging one count of failure to pay minimum wages under the FLSA.  See Compl. ¶¶ 76-83.  After this Court's denial of Fannie's motion to dismiss the Complaint for failure to state a claim, Fannie's answered and asserted counterclaims of money had and received and unjust enrichment.[3]  July 31, 2018, Order [Doc. 14]; Answer, Affirmative Defenses, and Countercls. of Fannie's Inc. d/b/a Fannie's Cabaret ("Answer and Countercls.") [Doc. 15 at 16-25].  As to each counterclaim, Fannie's stated that if Kellogg were to prevail on any of her claims, and "no enforceable agreement or contract between Fannie's and Cristina Kellogg is found to exist or in fact exists," then Fannie's was entitled to equitable relief.  Id. ¶¶ 20, 27.

---

[3] Fannie's also raised a third counterclaim for breach of contract, which this Court dismissed upon Kellogg's motion.  See Answer and Countercls. ¶¶ 28-30; Jan 11, 2019, Order [Doc. 29].

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th

Cir. 1999).  A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles.  Anderson, 477 U.S. at 248.  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Id.

"If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita, 475 U.S. at 587 (citation omitted).

## III.  DISCUSSION

### A.    Parks's Motion for Summary Judgment

Parks contends that he is entitled to summary judgment because there is no genuine dispute of material fact that he was not Kellogg's "employer," an essential element of Kellogg's FLSA claim.  Mem. of Law in Supp. of Def. William H. Parks' Mot. for Summ. J. ("Parks's Mem.") [Doc. 78-2] at 5-6.  Specifically, Parks argues that he was not an employer because he was a minority owner of Fannie's, was not involved in the day-to-day operations of the club, and did not have any direct supervision over Kellogg, the decision to hire her, or the schedule that she worked.  Id. at 6.  Kellogg did not file a response to Parks's Motion for Summary

8

Judgment, which indicates that she does not oppose it. LR 7.1B, NDGa ("Failure to file a response shall indicate that there is no opposition to the motion."). Nevertheless, the Court will review the merits of the motion.[4]

The FLSA "premises liability on an employer-employee relationship." Patel v. Wargo, 803 F.2d 632, 635 (11th Cir. 1986). Whether a person is an "employer" turns on whether they "act[] directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C § 203(d). "The term employ includes to suffer or permit to work." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013) (quoting 29 U.S.C. § 203(g)) (quotation marks omitted).

---

[4] The Local Rules put Kellogg on notice that a failure to respond could result in a motion being considered unopposed. Local Rule 7.1 dictates that failure to respond to a motion within the applicable time period "shall indicate that there is no opposition to the motion." LR 7.1B, NDGa. Thus, pursuant to Local Rule 7.1, the factual allegations within Parks's SMF are deemed admitted because Kellogg has failed to controvert them. See LR 56.1(B)(2)(a)(2), NDGa; see also FED. R. CIV. P. 56(e)(1) (stating that when a party fails to respond to another party's assertion of fact, a court may consider the fact undisputed).

However, an unopposed motion for summary judgment does not mean the moving party automatically prevails because this Court is still required to consider the merits of the motion. See United States v. 5800 SW 74th Ave., 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."); see also FED. R. CIV. P. 56(e)(3) (stating that when a party fails to respond to another party's assertion of fact, a court may grant summary judgment if the motion and supporting materials "show that the movant is entitled to it").

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." De Leon-Granados v. Eller & Sons Trees, Inc., 581 F. Supp. 2d 1295, 1303 (N.D. Ga. Oct. 7, 2008) (internal quotation marks omitted) (quoting Patel, 803 F.2d at 637-38). As such, for corporate officers "[t]o be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." Id. (internal quotation marks omitted) (quoting Patel, 803 F.2d at 638); see Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160-61 (11th Cir. 2008) (concluding that the majority shareholder and "managing agent" of a company was not an "employer" where he did take an active role in day-to-day operations and was not involved in supervision, hiring, firing, or compensation decisions regarding employees); Godburn v. Adams Tile & Terrazo, Inc., No. 3:14-CV-114(CAR), 2017 WL 1217172, at *4 (M.D. Ga. Mar. 31, 2017) (concluding that co-owners of the company were not liable as "employers" where neither co-owner actually exercised any authority over the plaintiffs); see also Moore v. Appliance Direct, Inc., 708 F.3d 1233, 1237 (11th Cir. 2013) (concluding that, after considering the totality of the circumstances, the chief executive officer, who was a seventy-five

percent owner, was an "employer" because he also "guided company policy,"

"[gave] instructions to managers regarding job duties," "was the ultimate decision

maker at the company," "negotiated leases and vendor contracts," and directed

certain actions of the plaintiffs).

As an initial matter, Parks denies being the president of Fannie's and states

that he does not know who the president was.  Dep. of William H. Parks taken on

Aug. 14, 2019 ("Parks's Dep.") [Doc. 78-3] at 24.  Parks only admits that he was

the president at one time, but only until September 2004, when he sold seventy-

five percent of his interest in the company.  Id.

The record contains a modicum of evidence that contradicts Parks's

assertion.  Cargill's Rule 30(b)(6) deposition indicates that, in response to the

question, "[w]ho is the president of Fannie's, Inc.?" Cargill stated, "I believe Bill

Parks."  Cargill 30(b)(6) Dep. at 34.  Further, the Court also notes that, although

neither party cites to them, results of searches of business records for Fannie's

from the website of the Georgia Secretary of State, filed among the exhibits used

during the 30(b)(6) deposition, display Parks's name as the president or officer of

Fannie's for 2015 through 2017 [Docs. 76-7 through 76-11].  However, Cargill

could not confirm that theses searches accurately reflected the corporate structure

of Fannie's in 2015, 2016, or 2017.  See Cargill 30(b)(6) Dep. at 40 (responding to

the question, "Does this accurately reflect the corporate structure [or officers] of Fannie's in [2015, 2016, or 2017]?" Cargill stated, "I don't know," or "I don't recall.").

Even assuming that Cargill's statement and the business search results are sufficient to establish that Parks was Fannie's president, Parks was not an "employer" within the meaning of the FLSA because the undisputed facts establish that he was not involved in the day-to-day operations or supervision of employees during the time Kellogg worked there.  See De Leon-Granados, 581 F. Supp. 2d at 1303.  Specifically, the undisputed facts show that, since 2013, Parks had no management authority over the day-to-day operation of the club, no role in hiring or firing workers, including Kellogg, and no authority in determining workers' schedules and pay.  Parks's SMF ¶¶ 3-6.  Therefore, Parks's Motion for Summary Judgment is **GRANTED**.

### B.    Kellogg's Motion for Summary Judgment

Kellogg seeks summary judgment as to her claim for unpaid wages under the FLSA and on Fannie's counterclaims of money-had-and-received and unjust enrichment.  Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Kellogg's Mem.") [Doc. 80-7].

### 1.   Whether Kellogg was Properly Classified as an Independent Contractor

Under Eleventh Circuit precedent, "[t]o state a claim for failure to pay minimum (or overtime) wages under the FLSA, a plaintiff must demonstrate that (1) [s]he is employed by the defendant, (2) the defendant engaged in interstate commerce, and (3) the defendant failed to pay [her] minimum or overtime wages." Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc., 494 F. App'x 940, 942 (11th Cir. 2012) (citing Morgan v. Family Dollar Stores, Inc., 551 F. 3d 1233, 1277 n.68 (11th Cir. 2008)).  The Court will first address whether there is a disputed issue of material fact as to Kellogg's employee status at Fannie's.

The FLSA defines employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).  "Employees are entitled to be paid a minimum wage and overtime wages; independent contractors are not."  Hurst v. Youngelson, 354 F. Supp. 3d 1362, 1368 (N.D. Ga. Jan. 28, 2019) (citing Scantland, 721 F.3d at 1311). To determine whether an individual is an employee or an independent contractor, courts look at the "economic reality" of the relationship between the alleged employee and alleged employer.  Scantland, 721 F.3d at 1311 (citing Bartels v. Birmingham, 332 U.S. 126, 130 (1947); Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961); Aimable v. Long & Scott Farms, Inc., 20 F.3d 434, 439 (11th Cir. 1994)).  The label that the parties assign to the relationship or the

13

contract controlling the relationship does not govern the inquiry; instead, courts

focus on whether "the work done, in its essence, follows the usual path of an

employee." Scantland, 721 F.3d at 1311 (citing Rutherford Food Corp. v.

McComb, 331 U.S. 722, 729 (1947)).

> To make this determination, the court considers six factors:
>
> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

Id. at 1312. "These factors are not exclusive, and no single factor must control.

Rather, these factors guide the Court's analysis of economic independence – the

ultimate question being whether the worker was dependent upon finding

employment in the business of another or whether the employee was capable of

running an independent business." Hurst, 354 F. Supp. 3d at 1369 (citation

omitted).

Fannie's first contends that summary judgment is inappropriate because the

question of whether an individual is an employee or an independent contractor

involves a weighing of facts that is only appropriate for a jury to decide.  Resp. in

14

Opp'n to Mot. for Summ. J. ("Fannie's Resp.") [Doc. 84] at 3.  However, "[t]he determination of whether a worker is an employee or independent contractor is a question of law for the court." Hurst, 354 F. Supp. 3d at 1368 (citing Patel, 803 F.2d at 634 n.1); see also Hanson v. Trop, Inc., 167 F. Supp. 3d 1324, 1327 (N.D. Ga. 2016); Stevenson v. Great Am. Dream, Inc., No. 1:12-CV-3359-TWT, 2013 WL 6880921, at *3 (N.D. Ga. Dec. 31, 2013).

### a.    The Nature and Degree of Control

Because the parties dispute many aspects of the nature of the relationship between Kellogg and Fannie's, a summary of the disputed evidence is necessary to determine whether there are genuine disputed issues of material fact that preclude the Court's ability to find whether Fannie's exercised a degree of control over Kellogg sufficient to provide an indicia of employment.

According to Kellogg, Fannie's exerted control over its dancers in multiple ways.  First, she avers that Fannie's controlled the shift schedules of its dancers. On weekday evenings, between seven and nine dancers worked, and on weekend evenings between twenty to twenty-five dancers worked.  Kellogg Decl. ¶¶ 13-14. Dancers worked two types of shifts, "day" and "night," and were required to work two weeknights in order to work one weekend night the same week.  Id. ¶¶ 9-15. However, Hovanloo, another dancer who performed at Fannie's between August

2014 and May 2016, testified that while Fannie's tried to set her schedule "in the beginning," she told Dulaney she had a school schedule and thereafter was able to perform when she chose to do so.  Hovanloo Dep. at 21, 32-33.  With respect to whether Kellogg had a set schedule, Hovanloo testified that, "She was there before me a good bit, but a good bit she worked there" and, "[s]he worked there for a while . . . [s]he came in a lot, though, so I don't think they tell her anything."  Id. at 33-34.

Fannie's denies that any dancer has a predetermined schedule.  Cargill, the General Manager, testified that dancers set their own schedules, Cargill 30(b)(6) Dep. at 84, and also declared that, on some days, there were no dancers working at Fannie's at all, Cargill Decl. ¶¶ 5, 10.  He stated that dancers could arrive or leave at any time and were not required to work any particular times of day, days of the week, or number of days in a week or month.  Cargill Decl. ¶ 10.  Dulaney, the House Mom, also declared that dancers can come and go "as they please" and are not required to work any particular days of the week, any number of days of the

16

week, or any particular hours of the day.[5]  Decl. of Brandy Dulaney ("Dulaney

Decl.") [Doc. 84-4] ¶ 6.

     Kellogg next contends that Fannie's controlled dancers' on-the-job conduct.

According to Kellogg, Dulaney pressured dancers upon hiring to select

"independent contractor status" rather than "employee" status when completing

their forms.  Hovanloo Dep. at 32.  Indeed, Cargill testified that he was unaware of

any dancer at Fannie's opting to choose "employee" status when presented with

the forms.  Cargill 30(b)(6) Dep. at 102.  According to Kellogg, Dulaney instructed

dancers to perform a set of three songs on stage, in rotations based on the number

of dancers working that night.  Kellogg Decl. ¶¶ 6, 17.  Dulaney also instructed

that the second song of the set was to be performed topless and the third song,

nude.  Id. ¶¶ 7-8.  The dancers were instructed to remove a top after receiving five

dollars and to be completely nude after receiving ten dollars while on stage.  Id.

---

[5] Compare Dean v. 1715 Northside Drive, Inc., 224 F. Supp. 3d 1302, 1320 (N.D.
Ga. 2016) (finding that it was undisputed that the club's manager "told the dancers
the days and times when they performed"); Hanson, 167 F. Supp. 3d at 1329
(evidence supported that the defendant required the plaintiff to work at least three
shifts per week); Clincy v. Galardi S. Enters., Inc., 808 F. Supp. 2d 1326, 1332
(N.D. Ga. 2011) ("Members of the Club's management testified that entertainers
have been fined if they did not show up for a scheduled night without calling ahead
or worked at another strip club" the day they were scheduled to work at the
defendant's club and "there are some days over which entertainers do not appear to
have discretion in regards to their schedule.").

¶ 19.  Frequently, patrons of the club would "make it rain" by throwing a large number of one-dollar bills on the stage, but dancers were not permitted to pick up the tips themselves.  Id. ¶¶ 22-24.  Dulaney would collect these tips from the stage and deliver tips to the respective dancers in the dressing room.  Id. ¶¶ 25-26.

Kellogg stated that dancers were permitted to perform table-side dances, Fannie's set the price for a table dance at ten dollars, and patrons paid the fee directly to the dancer.  Id. ¶¶ 27-30.  Fannie's did not pay the dancers any money for a table dance.  Id. ¶ 31.  Dancers performed couch dances, a Fannie's Floorman collected "$30 or $40" directly from the patrons, and dancers did not receive any portion of the fees collected by the Floormen.  Id. ¶¶ 32-34.  Dancers also performed dances in VIP rooms, for which the Floorman would collect a fifty-dollar fee directly from the patron in connection with each thirty-minute session.  Id. ¶¶ 38-39; see also Hovanloo Dep. at 38 ("So tables are the only places where the girl just takes her ten and go versus a couch or VIP room . . . You have to hand it to [the bouncer] so he can let you in.").  Kellogg declared that dancers did not receive any portion of the fees collected by Fannie's in connection with the VIP rooms.  Kellogg Decl. ¶ 40.  Kellogg acknowledges that patrons would also pay a dancer directly for a thirty-minute VIP room session, and Fannie's did not set an

amount above the minimum charge that a dancer could request a patron to pay for these sessions.  Id. ¶¶ 41-42.

Kellogg also stated that dancers were required to participate in promotions, called "Two for One," where patrons could purchase two dances and receive a Fannie's t-shirt or cocktail.  Id. ¶¶ 44-46; see also Hovanloo Dep. at 26 (dancers "[had] to sell t-shirts . . . It was a two for one is what we called it.  So you would have to buy two dances to get a free t-shirt" every Friday and Saturday night).  Dancers were required to pay for the shirts that they did not sell.  Kellogg Decl. ¶ 47.  Dulaney also required holiday-themed costumes for Christmas, Halloween, certain football games, and on Fourth of July.  Id. ¶ 48.

However, according to Fannie's, Dulaney never pressured dancers to be independent contractors instead of employees, dancers were "not required to perform any particular number of stage dances, VIP dances, or table-side dances, or to perform any of these dances at all," and "there are no repercussions for not performing stage dances."  Dulaney Decl. ¶ 7, 22.  Cargill declared that "Fannie's did not control the types of dances" performed and that dancers "were not in any way required or coerced to perform on stage or in any 'rotation' and were not required to remove clothing at any time."  Cargill Decl. ¶ 12; see also Cargill 30(b)(6) Dep. at 102 ("If a dancer chooses not to work at all and sit on the couch

all day, that's her choice as an independent contractor."); Hovanloo Dep. at 38-39 (denying that anyone instructed her to be performing any type of dance in any location).  According to Cargill, Fannie's "did not at any time restrict a dancer's ability to collect tips from patrons, including, without limitation, tips from stage dances" and did not offer couch dances.  Cargill Decl. ¶¶ 18-19.

Cargill stated that Fannie's patrons were required to pay a minimum "service charge" of ten dollars for table-side dances and $300 per hour for VIP sessions, which were recorded in the Club's gross receipts.  Id. ¶¶ 17, 21; see also Income Statement, Ex. B to Cargill Decl. [Doc. 84-3 at 37-39].  Cargill also testified that dancers collected these minimum charges for table dances and VIP dances on behalf of the Club, would give the total amount to a manager or the House Mom who would retain a standard, forty-dollar "Tip Out" fee, and return the rest of the money to the dancer.[6]  Cargill 30(b)(6) Dep. at 116-18; see also Cargill Decl. ¶¶ 17, 23.  Cargill also declared that dancers were free to charge and retain tips above the minimum charges set by the Club, which the Club did not restrict in any way or record.  Cargill Decl. ¶¶ 18, 20.  Hovanloo's testimony confirmed that

---

[6] The parties refer to this forty-dollar fee in several different ways, including "service fee," "club fee," "house fee" and "tip-out."  For the sake of consistency here, the Court refers to this forty-dollar fee as the "Tip Out."

dancers could charge more in tips and that whatever a dancer charged above these minimums did not go to the Club.  Hovanloo Dep. at 42.

Cargill also declared that "Fannie's has never required dancers, including [Kellogg], to perform any non-dancing tasks, including t-shirt sales."  Cargill Decl. ¶ 14; see also Cargill 30(b)(6) Dep. at 102 (testifying that those dancers deemed by the Club to be independent contractors are not required to sell t-shirts or participate in promotions).  Dulaney also declared that dancers "are never required to wait tables, bartend, DJ, sell t-shirts, or any other activity."  Dulaney Decl. ¶ 5.  She confirmed that dancers were not required to participate in the promotions, "there are no repercussions for failing to 'sell' a t-shirt," and dancers "are not required to buy t-shirts from the club" or otherwise pay Fannie's for failing to sell them.  Id.  Cargill further declared that Fannie's did not regulate dancers' appearance, as they did not have any type of required uniform or dress, and they were never required to wear particular costumes, clothing, or hair styles.  Cargill Decl. ¶ 11.  Similarly, Dulaney stated that dancers are never required to look a certain way, that Fannie's did not require dancers to wear particular makeup, clothing, or hair, and never required dancers to lose weight.  Dulaney Decl. ¶ 4.  Hovanloo testified that "[Fannie's] act like if you don't lose weight, they will replace you.  But the same girls have been there, like, ten years, so I'm sure they don't enforce it. . . . That

21

club, the rules are not so enforced.  It's kind of like a free-for-all."  Hovanloo Dep. at 24.

As for other rules governing dancers' conduct, Kellogg avers that Fannie's posted a set of rules in the dressing room, which Fannie's does not dispute. Kellogg SMF ¶ 85; Fannie's SMF Resp. ¶ 85.  Hovanloo testified about the existence of such rules, saying that, "[t]here were various signs in the back.  Like, 'Put [Spirit's] stuff back if you use it' . . . Don't take her sprays home. Don't take her straightener home."  Hovanloo Dep. at 23-24.  However, Kellogg also provides a document titled, "Performers" that states, "The only behavioral guidelines that may be required to perform, is (sic) those set by the Liquor Board and the Adult Entertainment Laws of the Fulton County and the State of Georgia."  Performers, Ex. 26 to Cargill 30(b)(6) Dep. ("Performers Rules") [Doc. 76-27].  The rules primarily consist of regulations cited by sections to the Georgia Code.  See id. Three rules do not have code citations: (1) "Be 18 years of age to perform," (2) "Possess a valid 'Performers' Permit," and (3) "Perform table-side dances a specific distance from the customer."  See id.

Fannie's position is that it does not impose any significant rules on dancers, other than to obey the law, regulations, and ordinances, and that dancers were subject to the same rules as a member of the public would be—no prostitution,

underaged drinking, assault and battery, or illegal drug use.  Cargill Decl. ¶ 15;

Dulaney Decl. ¶ 3.  Hovanloo's testimony supports this.  <u>See</u> Hovanloo Dep. at 24

("There were rules.  Like, if you are under age, don't drink. . . Just don't have sex

in VIP.").

       Finally, Kellogg avers that Fannie's controlled the sign-out procedures at the

end of a dancer's shift.  According to Kellogg, dancers were required upon signing

out of their shift to tip Dulaney, the DJ, floormen, bartenders, security person, and

valet.  Kellogg Decl. ¶ 16.  Dancers were required to declare all of their tips to

Dulaney, who encouraged them to minimize this number for reporting.  <u>Id.</u>

¶¶ 49-50.  Hovanloo's testimony confirms this, as she testified that dancers tipped

the DJ, the bartenders, valet, and floormen, and that if you did not, you may risk

being fired.[7]  Hovanloo Dep. at 36, 43-44.  Kellogg stated that Dulaney would also

collect the Tip Out at the end of the night from each dancer, which was the only

money that dancers would give Fannie's.  Kellogg Decl. ¶¶ 52-53.  Hovanloo

testified that the amount of the Tip Out was not consistently forty dollars, and that

---

[7] However, while Hovanloo also testified that a dancer was fired, it was not for
failing to tip other employees, but for failing to consistently pay her Tip Out at the
end of the night.  Hovanloo Dep. at 44.

the amount was variable based on when they arrived for their shift.  Hovanloo Dep. at 35.

However, according to Fannie's, dancers were not required to tip other employees at the end of the night.  Cargill Decl. ¶ 24.  Cargill stated that, while dancers were free to tip whomever they chose at the end of the night, if other employees solicited tips from them, they would be subject to discipline.  Id.; see also Dulaney Decl. ¶¶ 16-17 (stating that she believed Fannie's personnel could be fired for soliciting tips from dancers," and "[i]n my experience, approximately 30% to 50% of dancers will voluntarily tip certain of Fannie's personnel on a given night."); Cargill 30(b)(6) Dep. at 114 (stating again that dancers were not required to tip other employees).  Fannie's also asserts that the Tip Out was not variable based on the time of a dancer's arrival.  Cargill Decl. ¶¶ 22-23; Dulaney Decl. ¶ 14.  Cargill further stated that he was the one who set the price at forty dollars and that,

> [a]t the end of the night, typically it would either be the manager or the house mom, I believe, who would collect the service fees from the entertainer and retain the $40 dollar – the $40 dollars in service fees and give her the rest of the money back . . . that's the way it's – its supposed to be done, I've told them to do it.

Cargill 30(b)(6) Dep. at 117-18.

Fannie's has produced Kellogg's Compensation Receipts and Compensation Logs.  Ex. C to Cargill Decl. [Doc. 84-3 at 70-79] ("Compensation Receipts"); Ex. C to Cargill Decl. [Doc. 84-3 at 40-69] ("Compensation Logs") at 51-52.  The Compensation Receipts confirm that Fannie's retained a forty-dollar Tip Out at the end of the night.  See Compensation Receipts.  The Compensation Receipts also demonstrate that, regardless of the time Kellogg arrived, only forty dollars was retained.  Id.  This is consistent with the Compensation Logs, showing that, even if Kellogg arrived at ten o'clock or later in the evening, only forty dollars was retained.  See Compensation Logs at 51-52.  There is also no indication from the Compensation Receipts or Compensation Logs that Fannie's was keeping track of whether dancers were tipping other employees of the Club or recording dancers' tips above what they received in "service charges."  See Compensation Receipts and Compensation Logs.

The Compensation Receipts are revealing for other reasons as well.  First, they show that table dances and VIP rooms had consistent charges associated with them.  See Compensation Receipts; Compensation Logs.  Second, Kellogg's compensation receipts for 2017 total $5,210, which Fannie's has admitted would

be the amount of damages it would seek if the Court found her to be an employee.[8]

Cargill 30(b)(6) Dep. at 94.  This appears to confirm Fannie's position that it paid

Kellogg a total of $5,210 from the minimum charges on table dances and VIP

rooms during the time she worked at Fannie's.

Third, the Compensation Receipts contain a line for "Optional Breathalyzer"

and whether the dancer's keys were taken on a given night.  See Compensation

Receipts.  In Hurst, to find that the dancers were employees, the court relied on,

among other things, the facts that dancers had to turn in their keys before starting

their shift, submit to a breathalyzer test before being able to retrieve their keys

before leaving, purchase drink tickets, abide by the minimum prices for dances set

by the nightclub, and risk fines for leaving early.  Hurst, 354 F. Supp. 3d

at 1370-71.  Such a structure demonstrated that the nightclub controlled the

conditions under which the dancer worked, and it was confirmed by "sign-in

---

[8] In the 30(b)(6) deposition, Cargill is asked about the discrepancy of around $100
between the Compensation Receipts and Kellogg's 1099 tax form for reporting
miscellaneous income.  Cargill 30(b)(6) Dep. at 96.  However, it appears that any
such discrepancy was based on a typographical error and is not otherwise
meaningful.

Regarding the 1099 forms, the parties do not discuss the conflicting evidence about
who helped to prepare these forms and how much control the Club had over the
numbers reflected.  See Hovanloo Dep. at 39-40; Cargill 30(b)(6) Dep. at 95-96;
Dulaney Decl. ¶ 10.

sheets" kept by the DJ.  Id. at 1370.  These sheets had a space for each dancer labeled "tipped out," presumably to check off each dancer for having paid the Tip Out fee at the end of the shift.  Id.  There was also a note on these sheets: "there will be no arguing or getting angry with the entertainers.  If they do not tip correctly, have the Manager talk with them."  Id. (alterations accepted).

Here, Kellogg does not allege that these tests were required, and Hovanloo testified that the dancers were not disciplined for failing to take the breathalyzer, and that "it became more for the obviously drunk."  Hovanloo Dep. at 43.  Cargill also stated that the breathalyzer was not required but done voluntarily to "keep people from driving intoxicated to protect the entertainers and staff and others."  Cargill 30(b)(6) Dep. at 124-25.  In some instances, and in line with this testimony, Kellogg's Compensation Receipts do not indicate whether she took the breathalyzer or whether her keys were collected, or both.  Compensation Receipts.  Thus, the Compensation Receipts do not confirm control over the dancers in the same way as the sign-in sheets in Hurst because, while the lines for the breathalyzer test and keys exist, it does not appear that dancers were required to satisfy those conditions.

Finally, while Kellogg has averred that she worked at Fannie's from June 2014 to July 2018, Cargill declared that, as the custodian of Fannie's business

records, he produced the Compensation Receipts that reflect that Kellogg worked only twenty-nine shifts in 2017. Cargill Decl. ¶ 25; <u>see</u> Compensation Receipts. Cargill declared that Kellogg did not work at Fannie's at any time other than what was reflected by these documents, "including any time in 2015, 2016, or 2018." Cargill Decl. ¶ 26. Kellogg has not replied to this assertion or provided evidence to the contrary. The Court finds this significant because, if Hovanloo stopped working at Fannie's in 2016, then much of her testimony regarding the environment at the Club and the procedures in place may not be relevant.

In <u>Clincy</u>, another an important factor that the Court considered in finding control was the nightclub's authority to enforce its behavioral rules, even if it did not do so consistently. <u>See Clincy</u>, 808 F. Supp. 2d at 1345. Specifically, the court noted that "while the rules may not be enforced consistently or uniformly, the Club's management has the authority to fine or otherwise discipline entertainers for not complying with the rules, and has done so." <u>Id.</u> Here, the only undisputed evidence that dancers were fined or reprimanded for some conduct is Hovanloo's testimony that she was suspended for an altercation with a patron, which classifies as an assault. Hovanloo Dep. at 27-28. Otherwise, the parties dispute whether dancers were disciplined for any other conduct. Cargill and Dulaney stated that behavioral rules beyond following the law did not exist, and rules based solely

local ordinances, regulations, or laws have not been used to support the element of control.  See Clincy, 808 F. Supp. 2d at 1345 (noting that the applicable behavioral rules went beyond local ordinances and laws); Stevenson, 2013 WL 6880921, at *4 (relying on rules that regulated nightclub-specific, on-the-job conduct); Hurst, 354 F. Supp. 3d at 1368 (same); Hanson, 167 F. Supp. 3d at 1327 (same).  While the Club had at least one relevant rule regarding the table-dance distance and it appears from Hovanloo's suspension that Fannie's had the authority to discipline its dancers, the Court finds the record devoid of evidence relied upon in other cases, such as testimony from the nightclub's management that they had the authority to discipline dancers, that they fined entertainers who did not call or show for their self-selected shifts, for working at another club, or for under-reporting the amount they were supposed to tip the DJ, or that it was the manager's responsibility to ensure that entertainers were on stage when called.  See Clincy, 808 F. Supp. 2d at 1345.

Given all the disputed material facts referenced above, this Court cannot find as a matter of law at this time that Fannie's exercised such control over Kellogg's dancing at the Club to support a finding that she was an employee.  Specifically, Fannie's presents evidence that it had such little control over dancers' schedules that there may not be any dancers working at the Club on some nights.  Moreover,

where variable Tip Outs have been found to be evidence of control, see Hurst, 354

F. Supp. 3d at 1370 (finding that because the amount of the fee varied based on

dancers arrived for work, it was used to control the shifts they worked), Fannie's

has provided Compensation Logs showing that the amount of Tip Out every night

was consistent.  Where mandatory prices for table-dances and VIP rooms have

been evidence of control, Hanson, 167 F. Supp. 3d at 1330, both Kellogg and

Hovanloo testified that dancers could collect more in tips.

Frankly, with respect to the nature and degree of control over the dancers at

Fannie's, Kellogg's evidence is much thinner than that offered in other cases in

this district brought by performers at strip clubs, and Fannie's has succeeded in

presenting enough contradictory evidence to create disputed issues of material fact

with respect to this important factor.  Based on the evidence currently before it, the

Court is unable to conclude as a matter of law that Fannie's exercised enough

control over Kellogg to classify her as an employee.[9]  See Bally v. Dreams

Cabaret, LLC, No. EP-17-CV-30-DB, 2018 WL 456029, at *4-6 (W.D. Tex. Jan.

---

[9] The Court notes, as did the court in Hurst, that in two other cases outside this
district where adult entertainers were not found to be employees, the reasoning and
analysis was "scant" and could not be relied upon.  See Hurst, 354 F. Supp. 3d
at 1369 n.4 (rejecting the legal analysis in Hillborn v. Prime Time Club, Inc., No.
4:11CV00197 BSM, 2012 WL 9187581 (E.D. Ark. July 12, 2012), and Matson v.
7455, Inc., No. CV 98-788-HA, 2000 WL 1132110 (D. Or. Jan. 14, 2000)).

16, 2018) (finding no control in the absence of documentary evidence where the general manager's affidavit contradicted plaintiffs' testimony that defendants controlled their schedules, set minimum prices for stage performances, and otherwise controlled dancers' appearance and conduct on the floor); Herrera v. JK & HE Bus., LLC, No. H-14-2986, 2016 WL 8193294, at *7-8 (S.D. Tex. Oct. 14, 2016) (holding that the lack of evidence regarding the level of control the club exerted on its dancers prevented it from granting partial summary judgment on the issue of whether the plaintiffs were employees or independent contractors).

### b.   Opportunity for Profit or Loss

"The second factor is whether the putative employee's opportunity for profit or loss depending on managerial skill." Hurst, 354 F. Supp. 3d at 1374. Here, like in Hurst, Kellogg profited by selling dances to customers. Fannie's argues that Kellogg had the opportunity to exercise certain managerial skill and decisions because she had the opportunity to charge more than the compulsory minimum charges. Fannie's Resp. at 7-8. It also contends that "in exchange for the risk of investing her time, money, and supplies, [Kellogg] also had the opportunity to retain substantially all of the upside of that risk" after the Club retained its forty dollars at the end of the night. Id. This argument previously has been rejected in this district. See Hanson, 167 F. Supp. 3d at 1331 (finding that the dancer's

31

ultimate ability to earn a profit was minor compared to the night club, and noting that the argument that dancers could "hustle" to increase their profits "has been universally rejected").

However, the Court notes that, in considering this factor, <u>Hurst</u> relied on the "undisputed facts show[ing] that Defendants controlled all aspects of the club's operation and thus were primarily in control of Plaintiff's opportunity to make a profit." <u>Hurst</u>, 354 F. Supp. 3d at 1374. As discussed above, the facts about the level of control that Fannie's exerted over Kellogg are in dispute; namely, whether or how much a dancer was able to charge above the minimum prices for table dances and VIP rooms that were set by the Club. Nevertheless, this factor ultimately weighs in Kellogg's favor because the amount she earned at Fannie's on any given night was directly related to the number of patrons the Club was able to attract on a given night. <u>See</u> <u>Hurst</u>, 354 F. Supp. 3d at 1374 (discussing the nightclub's level of control and how it influenced a dancer's ability to earn, but noting how much more the nightclub risked in overhead costs than the dancer); <u>Clincy</u>, 808 F. Supp. 2d at 1346 (relying on the nightclub's ability to attract customers to find that the nightclub had the greater risk of loss and chance for profit).

### c.    Investment in Equipment or Materials

The third factor is "the alleged employee's investment in equipment or materials required for [her] task, or [her] employment of workers." Hurst, 354 F. Supp. 3d at 1375.  Courts have analyzed this third factor of the economic realities test by comparing the investment of the dancer to the investment of the nightclub. See Hurst, 354 F. Supp. 3d at 1375; Hanson, 167 F. Supp. 3d at 1331; Clincy, 808 F. Supp. 2d at 1346-47; Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1350 (M.D. Fla. 1997).  Kellogg contends that her investment in her work at Fannie's was minimal, relative to what Fannie's expended.  Kellogg's Mem. at 12. Fannie's asserts that the costs it expended are irrelevant in this comparison because they were merely costs associated with running a bar and not specific to providing the space for Kellogg's dancing.  Fannie's Resp. at 8.  The Court disagrees.

All of the dancers had access to the building and the bar, and the Club attracts new patrons by incurring more expenses to run the bar and nightclub. See Hurst, 354 F. Supp. 3d at 1376 ("The dancers had access to nearly the entire building and were integral to the business's operation.  All expenses related to the operation of the building were part of [the nightclub's] expenses."); Harrell, 992 F. Supp. at 1350 (collecting cases) ("[A] dancer's investment is minor when compared to the club's investment.").  Thus, comparing the expenses incurred by

Kellogg and by Fannie's, the Court finds that this factor also weighs in Kellogg's favor.

### d.  Special Skill

The fourth factor is "whether the service rendered requires a special skill." Hurst, 354 F. Supp. 3d at 1376.  Like in Hurst, Fannie's does not dispute that adult entertainers' dancing requires no special skill, Fannie's Resp. at 7-11, and other courts have confirmed the same.  Id.; see also Clincy, 808 F. Supp. 2d at 1348; Hanson, 167 F. Supp. 3d at 1332.  Thus, this factor weighs in favor of finding an employer-employee relationship.

### e.  The Degree of Permanency and Duration of Relationship

"The fifth factor is the degree of permanency and duration of the working relationship.  Permanence or a longer duration suggest an employment relationship.  Courts have considered the consistency of the work, whether the job was the primary source of employment, and the duration of the relationship." Hurst, 354 F. Supp. 3d at 1366.  This court has found that "[r]elationships with a club that extend over one year can signify permanence."  Id. (citing Clincy, 808 F. Supp. 2d at 1348).

Here, as discussed above, the parties dispute how long Kellogg worked at Fannie's.  Kellogg claims to have worked from June 2014 through July 2018, and

Hovanloo testified that Kellogg had worked there "for a while" and "was already established there."  Kellogg Decl. ¶ 3; Hovanloo Dep. at 34.  However, Cargill states in his declaration that Kellogg only worked shifts during the year 2017 and that all of the Compensation Receipts produced reflected the entirety of Kellogg's work history at Fannie's.  Cargill Decl. ¶¶ 25-26.  If it is true that Kellogg worked only twenty-nine shifts in 2017, then this factor would not weigh in favor a finding an employer-employee relationship.  However, courts have found this factor to be "only modest weight in assessing employee status under the FLSA."  See Hanson, 167 F. Supp. 3d at 1332; Hurst, 354 F. Supp. 3d at 1377.  Given the dispute of material facts as to the degree of permanency and duration of the relationship, the Court cannot find that this factor weighs for or against an employment relationship.

### f.    Integral Part of the Business

The last factor is "the extent to which the service rendered in an integral part of the alleged employer's business."  Hurst, 354 F. Supp. 3d at 1377.  Here, Kellogg argues that the primary role of Fannie's business was a nightclub providing entertainment in the form of nude female dancers.  Kellogg's Mem. at 14-15.  While Cargill disputes this, stating that the "central focus of Fannie's business" is a bar, serving alcoholic and non-alcoholic beverages, Cargill 30(b)(6) Dep. at 22, both parties agree that the website stated, "Atlanta's Premier Adult

Entertainment is Exclusively at Fannie's Cabaret. Staffing over 250 entertainers with a carefully balanced mix of the most beautiful women in Atlanta." Cargill 30(b)(6) Dep. at 22; Kellogg's SMF ¶ 23; Fannie's SMF Resp. ¶ 23. Coupled with the promotional images from Fannie's website [Docs. 76-3 through 76-5], the Court finds that there is no genuine dispute that nude female dancing was an integral part of Fannie's business. Thus, this factor weighs in favor of finding an employer-employee relationship.

### g.     Balance of the Factors

The factors of the economic realities test are not exclusive, and no one factor controls. Scantland, 721 F.3d at 1312 n.2. "The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case." Id. (collecting cases) (internal quotation marks and citations omitted). Ultimately, the question is whether "an individual is in business for himself or is dependent upon finding employment in the business of others." Id. at 1312 (internal quotation marks and citation omitted).

At summary judgment, it is ultimately the movant's burden to show that there is no genuine dispute of material fact that an employer-employee relationship exists. Celotex, 477 U.S. at 323. Here, there is much about the relationship between Fannie's and its dancers that remains disputed. Based on the case law in

this district which has concluded on numerous occasions that adult entertainers

performing at clubs are employees entitled to FLSA protections, it would seem

unlikely that Fannie's has created a structure so unique that it avoids the

requirements of the FLSA.  However, in all of these cases, there was undisputed

evidence that most if not all of the six factors of the economic reality test,

including the nature and degree of control, supported the conclusion that the

dancers were employees.  See Hurst, 354 F. Supp. 3d at 1369-1374 (all six

factors); Vaughn v. M-Entm't Props., LLC, No. 1:14-CV-914-SCJ, 2016 WL

7365201 (N.D. Ga. Mar. 15, 2016), at *7-10 (all factors other than permanency of

the relationship); Dean, 224 F. Supp. 3d at 1320-1322 (all six factors); Stevenson,

2013 WL 6880921, at *4-5 (all factors other than permanency of relationship);

Hanson, 167 F. Supp. 3d at 1329 (all six factors); Clincy, 808 F. Supp. 2d

at 1343-50 (all factors other than permanency of relationship).

It would be improper for this Court to weigh what are disputed issues of

material fact in this case.  It will be up to a jury to determine the true economic

reality between Kellogg and Fannie's.  The Court acknowledges that much of the

disputed evidence relates mainly to the first factor of the nature and degree of

control but this is a crucial factor, and the evidence presented at trial may shed

additional light on the true nature of the atmosphere at the Club, how dancers were

treated, what was required in form or in practice, what dancers were required to report, what dancers could be punished for, and how much the Club made in relation to the dancers.  See Jones v. Pawar Bros. Corp., No. 17-CV-3018(PKC)(JO), 2020 WL 364168, at *9 (E.D.N.Y. Jan. 22, 2020) (denying summary judgment on the issue of employee status because, "[i]n sum, while some of the factors lean one way or the other, they do not provide a definitive answer regarding Plaintiff's employee status, due to insufficient or disputed facts."); Wright v. Travellooga, LLC, No. 14-62024-CIV-ZLOCH, 2016 WL 7626203, at *4 (S.D. Fla. Sept. 2, 2016) (denying summary judgment on the issue of employee status because there were factual issues of dispute regarding whether the plaintiff chose his hours, the degree of control defendants exercised  over his work, and whether he was able to seek additional jobs); see also Mendel v. City of Gibraltar, 727 F.3d 565, 570 n.6 (6th Cir. 2013) (acknowledging the district court's emphasis on the control factor as an important factor in the economic realities test, but reversing based on the particular, known working relationship between the firefighters and the city).

Due to the remedial purpose of the FLSA, this Court is cognizant that, in applying the economic realities test, "[w]hen a disposition in either direction can be justified, the Court must err in favor of a broader reading of 'employee.'"

Hanson, 167 F. Supp. 3d at 1328.  However, no case from this district cited by either party, or independently reviewed by this Court, has found an employer-employee relationship to exist in these circumstances with the production of as little uncontradicted evidence as in this case.  The Court does not opine that Fannie's failed to exert sufficient control or authority over Kellogg, but rather that the undisputed evidence before it does not support such a conclusion at this stage of the litigation.   Indeed, based on the factual disputes related to the level of control, determining whether Kellogg was misclassified as an independent contractor would require the Court to evaluate the credibility of witnesses' testimony and declarations.  The Court will not make such credibility determinations on summary judgment.  Anderson, 477 U.S. at 255.  Thus, the Court cannot conclude as a matter of law that Kellogg was an employee or independent contractor.

### 2.      Offsetting Minimum Wage Obligations

Kellogg also seeks summary judgment on the issue of whether the money she received constituted service charges or tips, so that Fannie's is not entitled to a set-off of its minimum wage obligations.  Kellogg's Mem. at 16.  "The FLSA allows employers to use service charges to offset the employer's obligations to pay employees."  Hurst, 354 F. Supp. 3d at 1383 (citing 29 C.F.R. § 531.55(b)).  "To

39

be a service charge, the fee must be (1) recorded in a company's gross receipts, and

(2) distributed by the company to the employee." Id. (citing Henderson, 110 F.

Supp. 3d at 1322). Resolving this issue requires finding that Kellogg was an

employee of Fannie's. Because genuine disputes of material fact preclude the

Court finding that Kellogg was an employee, Kellogg is also not entitled to

summary judgment on this issue.[10]

### 3. Remaining Issues

Kellogg also seeks summary judgment on several remaining issues. First,

she contends that she is entitled to summary judgment on the defense that Fannie's

violations of the FLSA were made in good faith. Kellogg's Mem. at 20-23. "The

court has discretion not to award liquidated damages if it finds that the defendant

---

[10] The Court also notes the factual dispute here, which is related to the disputed evidence regarding the amount of money Kellogg was paid at the end of every night and where this money came from. Kellogg's SMF ¶¶ 128-29, 131-32; Fannie's SMF Resp. ¶¶ 128-29, 131-32. While Kellogg states that, at the end of the night, she only paid Dulaney the forty-dollar Tip Out and did not receive anything else from the Club, the Compensation Receipts and her 1099 tax form do not support her contention. See Compensation Receipts; Cargill 30(b)(6) Dep. at 96:1-21. Cargill stated that the Club did not record and dancers were not required to report the amount of tips they received in addition to the minimum charges, which is consistent with the 2017 Compensation Receipts and Compensation Logs, where the amount charged and collected appears to be the same every night. Cargill Decl. ¶ 20; see Compensation Receipts; Compensation Logs.

acted in good faith.  29 U.S.C. § 260.  However, unpaid wages must be awarded

regardless of the employer's good faith."  <u>Lamonica v. Safe Hurricane Shutters,</u>

<u>Inc.</u>, 711 F.3d 1299, 1307 n.2 (11th Cir. 2013).  Second, Kellogg contends that she

is entitled to summary judgment that Fannie's acted willfully.  Kellogg's Mem.

at 23-24.  A willfulness determination is relevant as to the applicable statute of

limitations.  <u>See</u> <u>Henderson v. 1400 Northside Drive, Inc.</u>, No. 1:13-CV-3767-

TWT, 2016 WL 325012, at *3 (N.D. Ga. June 3, 2016).  "The statute of limitations

for an ordinary minimum wage claim is two years.  If a plaintiff demonstrates a

willful violation of the FLSA, however, the statute of limitations extends to three

years."  <u>Id.</u> (citations omitted).  This court has stated that "[a] violation is willful if

the employer either knew or showed reckless disregard for the matter of whether

its conduct was prohibited by the [FLSA]," but that "[w]hether a violation is

willful is a jury question."  <u>Id.</u> (internal quotation marks and citations omitted).

Third, Kellogg contends that she entitled to summary judgment on Fannie's

counterclaims of money had and received and unjust enrichment.  Kellogg's Mem.

at 24-25.  Fannie's alleged in its Answer that these counterclaims depended on

whether Kellogg was an employee of the Club and whether Fannie's violated the

FLSA.  The Court agrees.

Resolving all three of the above issues requires finding that Fannie's violated the FLSA. Because genuine disputes of material fact preclude the Court from determining that Kellogg was an employee and that Fannie's violated the FLSA, Kellogg is also not entitled to summary judgment on these issues.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Parks's Motion for Summary Judgment [Doc. 78] is **GRANTED** and Kellogg's Motion for Partial Summary Judgment [Doc. 80] is **DENIED**. Defendant William H. (Brian) Parks is **DISMISSED** as a party defendant in this case.

It is further **ORDERED** that the parties shall file a consolidated pre-trial order within thirty (30) days of the date of this Order.[11]

**IT IS SO ORDERED** this 16th day of June, 2020.

_____
MARK H. COHEN
United States District Judge

---

[11] In the event the parties agree to adopt the previous Pretrial Order entered by the Court [Doc. 57], the parties need only inform the Court of that agreement rather than filing the same proposed Pretrial Order as previously filed.